TOOKEY, J.
*12 Defendant appeals a judgment of conviction for possession of methamphetamine, ORS 475.894. Defendant assigns error to the trial court's denial of her motion to suppress evidence that a law enforcement officer discovered during a traffic stop. Defendant argues that the trial court erred in denying her motion to suppress because the law enforcement officer's questioning of defendant unlawfully *1207 extended the traffic stop. For the reasons that follow, we affirm.
"We review a trial court's denial of a motion to suppress for legal error." State v. Rondeau , 295 Or. App. 769, 770, 436 P.3d 49 (2019) (citing State v. Ehly , 317 Or. 66, 75, 854 P.2d 421 (1993) ). "We are bound by the trial court's factual findings if they are supported by evidence in the record." Id. "If the trial court did not make an express finding on a necessary fact, we presume that the court found the facts in a manner consistent with its decision." Id. We state the facts and analyze defendant's arguments accordingly.
I. HISTORICAL AND PROCEDURAL FACTS
Shortly after 10:00 a.m., Deputy O'Donnell, a narcotics K-9 handler with the Multnomah County Sheriff's Office, stopped defendant's car after he saw defendant make an unsignaled turn. O'Donnell approached defendant's car, explained to her why he had pulled her over, and asked her for her driver's license, vehicle registration, and proof of insurance. Defendant provided her driver's license to O'Donnell, but told O'Donnell that she did not have proof of insurance, although she did have insurance. She also told O'Donnell that she did not know where her vehicle registration was.
At 10:03 a.m., after obtaining defendant's driver's license, O'Donnell switched the radio he was wearing to the "service net" to request a records check. During the hearing on defendant's motion to suppress, O'Donnell testified that Multnomah County Sheriff's Office deputies use the service net to run records checks during traffic stops. He also testified that, in order to write a traffic citation, he has to find out if a driver has a suspended license, which is one *13 piece of information a records check provides. In this case, after contacting the service net dispatcher, the dispatcher told O'Donnell that he was in line, which meant that the dispatcher was working on other tasks and O'Donnell had to wait in line for his turn.
O'Donnell testified that the other option he has for running a records check during a traffic stop is to return to his patrol car to use the car's computer. That option requires him to manually enter a driver's information and "read the responses that c[o]me back." O'Donnell uses the service net in 80 to 90 percent of the stops he makes, and it is "oftentimes" faster than using the computer.[1] The only time the service net might not be the faster option is when the dispatcher tells the radioing deputy that she or he is in line.
In this case, while waiting for his turn on the service net, O'Donnell spoke with defendant about the high-crime nature of the area and asked her whether she had any drugs in her car. Defendant admitted that she had a small amount of methamphetamine in her purse. O'Donnell then advised defendant of her Miranda rights and called for back-up.
Shortly thereafter, at 10:08 a.m., the dispatcher told O'Donnell that it was his turn, and O'Donnell gave the dispatcher defendant's information for the records check. Thus, a total of five minutes had passed from the time that the dispatcher told O'Donnell that he was in line until the time that the dispatcher informed O'Donnell that it was his turn. Approximately 30 seconds after O'Donnell provided the dispatcher with defendant's information, the dispatcher responded with the results of the records check.
Defendant was arrested at 10:09 a.m. Subsequently, defendant gave O'Donnell consent to search her car and told him that the methamphetamine was located in her purse in a "zebra case." O'Donnell conducted a search and *14 discovered a crystal-like substance that tested positive for methamphetamine.
Defendant was charged with one count of unlawful possession of methamphetamine, ORS 475.894. Prior to her trial, she moved to suppress all of the evidence obtained as a result of the traffic stop, arguing, among *1208 other points, that O'Donnell unlawfully extended the traffic stop by waiting in line with the service net rather than using the computer in his patrol car to process defendant's information. Defendant contended that this unlawful extension violated her rights under Article I, section 9, of the Oregon Constitution.[2] The state argued that O'Donnell's questioning of defendant was lawful because it took place during an unavoidable lull in the traffic stop.
At the hearing on defendant's motion to suppress, the state asked O'Donnell how long it would take to run a records check on his computer "if everything went smoothly." Defendant objected to that question as calling for speculation. After O'Donnell acknowledged that he would have to speculate to answer the question, the trial court sustained defendant's objection.
Ultimately, the trial court denied defendant's motion to suppress, concluding that O'Donnell's inquiry of defendant took place during an unavoidable lull in the traffic stop. The trial court found that, at the time the information regarding the drugs came to light, O'Donnell was not extending the traffic stop, but was simply waiting to get information from the dispatcher. Further, the trial court determined that there was no evidence from which it could infer that O'Donnell was trying to create an unavoidable lull, "or any lull," and characterized O'Donnell's testimony as providing that the service net is often the fastest way to process traffic stops "because you get on and you get the information quickly." It also determined that waiting for the *15 service net to process the stop was, in this case, a reasonable thing for O'Donnell to do because "from 10:03 [a.m.] to 10:08 [a.m.], [is] not an unreasonable amount of time" and "five minutes is still in the reasonable range for [O'Donnell] not to decide to go back to his car."
The trial court also noted what was not in the record-viz. , (1) evidence "as to how much time [the records check] might have taken had [O'Donnell] gone back to his car" to run the records check on the computer "and then [returned to] to [defendant's] window" and (2) "testimony as to what [O'Donnell] was told or what his experience is about what happens when you're told that you're in line."
II. ARGUMENTS ON APPEAL
On appeal, defendant argues the trial court erred in denying her motion to suppress because O'Donnell's questioning of defendant occurred during an unlawful extension of the traffic stop, rather than during an unavoidable lull in the traffic stop. More specifically, defendant contends that, because O'Donnell was put in line prior to giving the dispatcher any of defendant's information, O'Donnell was "waiting to initiate a records check" when he questioned defendant. (Emphasis in defendant's brief.) According to defendant, once O'Donnell was put in line, he "was required to pursue the alternative course of action available to him" to conduct the records check-viz. , to enter defendant's information into his patrol car's computer-instead of questioning defendant. In defendant's view, "the unrelated questioning of defendant was unlawful because it occurred at a time when no one was actively processing the stop." (Emphasis in defendant's brief.)
Defendant also contends that the trial court "incorrectly concluded that the deficiencies in the record"-i.e ., "the lack of evidence about (1) how long O'Donnell expected to be on hold with the service net, and (2) how long it would have taken for O'Donnell to run defendant's information through the" computer-"required it to deny defendant's motion to suppress because it could not find that the [computer] would have been faster than the service net." In doing so, according to defendant, the trial court did not hold the state to its burden of proof.
*16 The state, for its part, argues that a reasonableness inquiry governs our analysis *1209 of whether the traffic stop was unlawfully extended, and that inquiry reduces to "whether the overall citation-writing process was performed promptly and efficiently." According to the state, defendant's Article I, section 9, rights were not violated, because O'Donnell expeditiously proceeded with the steps necessary to complete the stop.
III. ANALYSIS
"When a defendant moves to suppress evidence discovered in a warrantless search, the burden is on the state to prove that the warrantless search did not violate a protected interest of the defendant." State v. Blackstone , 289 Or. App. 421, 430, 410 P.3d 354 (2017) (internal quotation marks and emphasis omitted).
Under Article I, section 9,
"[p]olice authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been unlawful, noncriminal activity, viz ., a traffic infraction. Police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed. Other or further conduct by the police, beyond that reasonably related to the traffic violation, must be justified on some basis other than the traffic violation."
State v. Rodgers/Kirkeby , 347 Or. 610, 623, 227 P.3d 695 (2010). "A traffic stop remains lawful for the time 'reasonably required' to investigate the traffic infraction and to complete the citation." State v. Middleton , 294 Or. App. 596, 602, 432 P.3d 337 (2018). Important to our analysis in this case, " Article I, section 9 *** is not implicated if an inquiry unrelated to a traffic stop occurs during a routine stop but does not delay it, that is, if it occurs during an 'unavoidable lull' in the investigation." State v. Leino , 248 Or. App. 121, 126, 273 P.3d 228, rev. den. , 352 Or. 76, 282 P.3d 1 (2012) ; see also State v. Reich , 287 Or. App. 292, 298, 403 P.3d 448 (2017) ("[P]olice may not unreasonably delay, or extend the duration, of an otherwise lawful stop to investigate unrelated matters for which they lack reasonable suspicion, but *17 investigations into unrelated matters that occur during an unavoidable lull are permissible." (Internal quotation marks and citation omitted.)).
"Under the unavoidable lull rule, whether an officer's inquiry about a matter unrelated to the reasons for a traffic stop unlawfully extends the stop depends on whether the officer makes the inquiry instead of expeditiously proceeding with the steps necessary to complete the stop." State v. Nims , 248 Or. App. 708, 713, 274 P.3d 235, rev. den. , 352 Or. 378, 290 P.3d 814 (2012). As we explained in Nims :
"An officer may inquire about unrelated matters if the officer is not in a position to proceed with the investigation of the traffic violations or the issuance of the citation-for example, if the officer is waiting for a driver to provide identification or waiting for the results of a records check-but an officer may not inquire about unrelated matters as an alternative to going forward with the next step in processing the traffic violation, such as the writing or issuing of a citation. Accordingly, we have held, for example, that an officer's request for consent to a search unlawfully extended a traffic stop where there was no evidence that, at the time the officer requested consent, he was awaiting the results of a record check, was waiting for the defendant to provide him items needed to continue the traffic stop, or was engaging in any other steps related to the investigation of the traffic offense or the issuance of a citation for that offense."
Id. (citing State v. Huggett , 228 Or. App. 569, 575, 209 P.3d 385 (2009), rev. dismissed , 348 Or. 71, 228 P.3d 582 (2010) (internal citations, quotation marks, emphases, and brackets omitted)).
We have stated that, "[t]he rule that officers may not extend the duration of a traffic stop by inquiring into unrelated matters *** applies regardless of the length of the extension." State v. Dennis , 250 Or. App. 732, 740, 282 P.3d 955 (2012) ; see also State v. Klein , 234 Or. App. 523, 528, 228 P.3d 714 (2010) (rejecting the state's argument that "[the officer's] questions about drugs took, at most, *1210 one minute, and *** any delay *** [was] a de minimis delay that did not render the duration of the traffic stop constitutionally unreasonable"). Nevertheless, we have not adopted the view that " Article I, section 9, is implicated every time there is a *18 delay in an officer's processing of a traffic stop." See State v. Aung , 265 Or. App. 374, 379, 335 P.3d 351, rev. den. , 356 Or. 575, 342 P.3d 88 (2014) ; see also id. at 376, 335 P.3d 351 (noting the defendant's argument that an officer asking a different officer to "finish the citation[ ] unlawfully extended the duration of the stop because physically exchanging the citation delayed the completion of the citation" if only by "a few seconds" (internal quotation marks omitted)).
In this case, we conclude that the trial court did not err in denying defendant's motion to suppress, because O'Donnell's question to defendant regarding whether she had any drugs in her car took place during an unavoidable lull in the traffic stop. Importantly, O'Donnell did not question defendant about matters unrelated to the traffic stop "instead of expeditiously proceeding with the steps necessary to complete the stop." Nims , 248 Or. App. at 713, 274 P.3d 235. Rather, after stopping defendant for a traffic violation, O'Donnell began the process of issuing a citation to defendant by following his standard procedure-obtaining the driver's information and then starting a records check by contacting a dispatcher on the service net.[3] See Aung , 265 Or. App. at 379-80, 335 P.3d 351 (officer did not question defendant "as an alternative" to processing traffic citation where, among other facts, the officer "stopped defendant for a traffic violation and then proceeded with standard procedure" of obtaining "defendant's identification and return[ing] to his patrol car to run a 'records check' "). Further, as noted above, the trial court characterized O'Donnell's testimony as providing that the service net is often the fastest way to process traffic stops. We also note that it is a widely used method to conduct records checks, which are routine during traffic stops. See, e.g. , Wayne R. LaFave, 4 Search and Seizure § 9.3(c) (5th ed 2012) (noting that the "checking of [certain] government records incident to a 'routine traffic stop,' which usually takes a matter of minutes, is well-established as a part of the 'routine,' " and is performed "via radio or computer" (footnotes omitted)); Leino , 248 Or. App. at 127, 273 P.3d 228 ("[I]n numerous cases, we have indicated that an officer's action in contacting dispatch with *19 a defendant's identifying information is within the scope of a lawful traffic stop.").
This was not a case where an officer stopped processing a traffic stop to make inquiries about an unrelated criminal investigation. Aung , 265 Or. App. at 379, 335 P.3d 351 (noting "the unremarkable proposition that an officer unlawfully extends a traffic stop if the officer ceases to process the citation and instead, without justification, begins making inquiries unrelated to the traffic stop"). Or a case where an officer's actions prevented the officer from expeditiously proceeding with the steps necessary to complete a stop. Cf. State v. Cowdrey , 290 Or. App. 415, 422 n. 1, 416 P.3d 314, rev. den. , 363 Or. 283, 432 P.3d 1079 (2018) (accepting the state's concession that stop was extended when an officer "provided cover" for another officer, which distracted her from completing the defendant's citation, instead of "expeditiously proceeding with the steps necessary to complete the stop"). Instead, based on the facts set forth above, we agree with the trial court that, at the time the information regarding the methamphetamine came to light, O'Donnell was not extending the traffic stop. O'Donnell did not question defendant about matters unrelated to the traffic stop "instead of expeditiously proceeding with the steps necessary to complete the stop." Nims , 248 Or. App. at 713, 274 P.3d 235.
Defendant's arguments to the contrary do not persuade us. We first consider defendant's argument that, once O'Donnell was put in line, he "was required to pursue the alternative course of action available to him" to conduct the records check-viz. , entering defendant's information into his patrol car's *1211 computer-because he was "waiting to initiate a records check," instead of waiting for the results of a records check, and that "the unrelated questioning of defendant was unlawful because it occurred at a time when no one was actively processing the stop." (Emphases in defendant's brief.)
The difficulty with that argument is that O'Donnell was not "waiting to initiate a records check" when he asked defendant if she had any drugs in the car. To the contrary, he had already initiated the records check by contacting dispatch, and he was waiting for his turn to provide *20 information to dispatch. That dispatch had, as part of its orderly processing of tasks, put O'Donnell in a queue, does not mean that his request was not being processed. While he was waiting for his turn to provide information to dispatch using the method that he had chosen to use, which, as noted above, is "oftentimes" the fastest method, O'Donnell was "not in a position to proceed with the investigation of the traffic violation[ ] or the issuance of the citation." Nims , 248 Or. App. at 713, 274 P.3d 235. Neither we nor the Supreme Court have held that an officer who is expeditiously proceeding with a traffic stop investigation must switch methods of obtaining information during the course of the investigation where an event-in this case, being put in line-means an alternative method of gathering information might (or indeed might not) be faster. In this case, as noted above, at the time the information regarding the methamphetamine came to light, O'Donnell was not extending the traffic stop.[4] See State v. Urig , 289 Or. App. 693, 697, 412 P.3d 1196, rev. den. , 363 Or. 390, 434 P.3d 32 (2018) (affirming denial of motion to suppress where the trial court "implicitly found" an officer did not extend a stop, there was evidence in the record to support that finding, and therefore the defendant could not show that the officer's "questions about drugs and requests for consent to search occurred during any 'extension' of the stop beyond the time ordinarily required"); see also State v. Watson , 353 Or. 768, 782, 305 P.3d 94 (2013) ("Because [the officer] conducted *21 the records check with the purpose of verifying defendant's driving privileges, [the officer's] detention of defendant to conduct that check did not violate Article I, section 9, unless the detention was unreasonably lengthy.").
We turn to defendant's argument that the trial court "incorrectly concluded that the deficiencies in the record"-i.e. , "the lack of evidence about (1) how long O'Donnell expected to be on hold with the service net, and (2) how long it would have taken for O'Donnell to run defendant's information through the" computer-"required it to deny defendant's motion to suppress because it could not find that the [computer] would have been faster than the service net." We disagree with defendant. Even absent the information in the record noted by defendant, the evidence that is in the record indicates, as discussed above, that O'Donnell did not question defendant as an alternative to expeditiously proceeding with the traffic stop investigation. On this record, there is no basis to determine that use of the service net, as opposed to the computer, created an unlawful extension of the stop. See Leino , 248 Or. App. at 124-25, 128, 273 P.3d 228 (rejecting argument that a "records" check is permissible, but a "warrant"
*1212 check is not, where an officer used the "service net" to perform both checks, there was "no indication that the dispatcher required additional time to check for 'warrants,' " and the officer received a response from dispatch "within a very few minutes").
In light of our analysis above, we affirm.
Affirmed.

O'Donnell explained that he prefers to use the service net during most traffic stops because it allows him to observe the occupants of the vehicle, allowing him to address any potential safety issues. He further explained that he would use the computer in his patrol car when staying near a stopped vehicle was unsafe due to the flow of traffic, or if weather conditions necessitated doing so.

Article I, section 9, of the Oregon Constitution provides:
"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Of course, in some instances, an officer's standard procedure may result in a violation of a defendant's Article I, section 9, rights. As explained in this opinion, however, that was not the case here.

In a memorandum of additional authorities, defendant relies on Reich , 287 Or. App. 292, 403 P.3d 448, to support an argument "that officers unlawfully extend a traffic stop when they forego available, non-redundant efforts towards processing the stop in favor of conducting a criminal investigation."
In Reich , we reversed a trial court's denial of a motion to suppress where officers stopped the defendant and requested the defendant's consent to search his person after receiving his license and the vehicle's registration but while still waiting for insurance information from the vehicle's owner, who was a passenger in the vehicle. Id. at 293-94, 302-03, 403 P.3d 448. We observed that the officers in Reich "could have expeditiously proceeded with the traffic stop investigation by asking [the vehicle's owner] to continue looking for the insurance, by looking for the insurance information themselves, or by running defendant's information through dispatch," but, "[i]nstead, the officers switched their focus to investigate an unrelated matter-the crime of possession of a controlled substance-'as an alternative to going forward with the next step in processing the traffic violation.' " Id. at 302, 403 P.3d 448 (quoting Nims, 248 Or. App. at 713, 274 P.3d 235 ).
Crucially, in this case, O'Donnell, unlike the officers in Reich , had already contacted dispatch to begin the records check. Consequently, Reich does not help defendant.